# EXHIBIT D

FELDMAN, SHEPHERD, WOHLGELERNTER & TANNER
BY: MARK W. TANNER
IDENTIFICATION NO.: 58738
25TH FLOOR
1845 WALNUT STREET
PHILADELPHIA, PA 19103
(215) 567-8300

ATTORNEYS FOR PLAINTIFF

---

| | |
|---|---|
| JUDITH & TIMOTHY STEELE, h/w<br>Plaintiff<br><br>v.<br><br>SAEID ALEMO, MD<br>and<br>UNIVERSITY NEUROSURGICAL PC<br>and<br>ALEMO'S NEUROLOGICAL &<br>NEUROSURGICAL ASSOCIATES, PC<br>and<br>HAHNEMANN UNIVERSITY HOSPITAL, TENET<br>HEALTHSYSTEM HAHNEMANN, LLC<br>and<br>NAZARETH HOSPITAL<br>Defendants. | COURT OF COMMON PLEAS<br>PHILADELPHIA COUNTY<br><br>SEPTEMBER TERM 2006<br><br>No. 003267<br><br>*Jury Trial Demanded* |

**NOTICE**

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

PHILADELPHIA BAR ASSOCIATION
LAWYER REFERRAL AND INFORMATION SERVICE
One Reading Center
Philadelphia, Pennsylvania 19107
Telephone: 215-238-6333 TTY: 215-461-8197

**AVISO**

Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Hace falta asentar una comparecencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR RAL SERVCIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

ASOCIACION DE LICENCIADOS DE FILADELFIA
SERVICO DE REFERENCIA E INFORMACION LEGAL
One Reading Center
Filadelfia, Pennsylvania 19107
Telefono: 215-238-6333  TTY: 215-461-8197

## COMPLAINT IN CIVIL ACTION

### I.   THE PARTIES

1.   Plaintiff, Judith Steele, is a citizen and resident of the Commonwealth of Pennsylvania, residing therein at 855 Foulkrod Street, Philadelphia, PA 19124.

2.   Plaintiff, Timothy Steele, is a citizen and resident of the Commonwealth of Pennsylvania, residing therein at 855 Foulkrod Street, Philadelphia, PA 19124.

3.   Defendant, Saeid Alemo, M.D., (hereinafter referred to as "Dr. Alemo") is a citizen and resident of the Commonwealth of Pennsylvania and maintains offices and a place of business in Philadelphia County at 2630 Holme Avenue, Suite 103, Philadelphia, PA 19152.

4.   Defendant, University Neurosurgical, P.C., is a corporation, organized and existing under the laws of the Commonwealth of Pennsylvania, with a principal place of business at 2630 Holme Avenue, Suite 103, Philadelphia, PA 19152

5.   Defendant, Alemo's Neurological and Neurosurgical Associates, P.C., is a corporation, organized and existing under the laws of the Commonwealth of Pennsylvania, with a principal place of business at 2630 Holme Avenue, Suite 103, Philadelphia, PA 19152.

6.   Defendant, Hahnemann University Hospital, Tenet Healthsystem Hahnemann, LLC, is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with a principal place of business at Broad & Vine Streets, Philadelphia, PA 19102.

7.   Defendant, Nazareth Hospital, is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with a principal place of business at 2601 Holme Avenue, Philadelphia, PA 19152.

-2-

8.     At all relevant times, Dr. Alemo was an agent, ostensible agent, servant, shareholder, and/or employee of University Neurosurgical, P.C., and/or Alemo's Neurological and Neurosurgical Associates, P.C., and/or Hahnemann University Hospital, Tenet Healthsystem Hahnemann, LLC, and/or defendant, Nazareth Hospital.

9.     At all relevant times, defendant, Hahnemann University Hospital, Tenet Healthsystem Hahnemann, LLC, operated a hospital at Broad and Vine Streets, known as Hahnemann University Hospital.

10.     At all relevant times, defendant, Nazareth Hospital, operated a hospital at 2601 Holme Avenue, Philadelphia, PA 19152.

11.     At all relevant times, Dr. Alemo was held out as a member of the Department of Neurosurgery at Hahnemann University Hospital, and was further represented to be a clinical assistant professor of neurosurgery at Hahnemann University Hospital.

12.     At all relevant times, defendant, Nazareth Hospital, held out defendant Dr. Alemo as a member of the Department of Neurosurgery of Nazareth Hospital, and further held him out as a competent practicing neurosurgeon.

13.     At all times relevant and material hereto, defendant Nazareth Hospital listed defendant Dr. Alemo on its website, and provided a web page with Dr. Alemo's photo and credentials, in which defendant Nazareth Hospital states "Nazareth Hospital is proud to recommend the physicians on our medical staff."

14.     At all times and relevant and material hereto, defendant Hahnemann University Hospital held Dr. Alemo as being a spine surgeon on staff at the hospital, and on their website, advertised to the public that when it came to "spine care," "for the small percentage of patients

-3-

who don't get sufficient relief from other treatment options, our staff specializes in progressive surgical techniques."

## II.   DR. ALEMO'S TREATMENT OF JUDITH STEELE

15.   On September 15, 2004, Dr. Alemo first saw Mrs. Steele, at which time she was complaining of low back and neck pain.

16.   Dr. Alemo saw Mrs. Steele again on September 28, 2004, at which time he diagnosed her as suffering from a Grade II to Grade III spondylolisthesis of L5-S1, and Dr. Alemo scheduled Mrs. Steele for surgery to take place three days later, on October 1, 2004.

17.   On October 1, 2004, Dr. Alemo performed a spinal surgery on Mrs. Steele at defendant, Hahnemann University Hospital which included bilateral L5 laminectomies, a GIL procedure, partial bilateral S1 laminectomies and foraminotomies, bilateral L5 foraminotomies, and L5-S1 diskectomy, interbody fusion of L5-S1 using a BAK carbon fiber cage, insertion of pedicle screw instrumentation, and bone grafting.

18.   During the course of this procedure, there was an injury to the dura surrounding Mrs. Steele's spinal cord, and she developed a leak of spinal fluid.

19.   This leak was not adequately repaired by Dr. Alemo at the time of the October 1, 2004 surgery.

20.   Following this surgery, Mrs. Steele continued to complain of back pain, pain into her legs, as well as puffiness and a collection of fluid around the wound.

21.   Dr. Alemo saw Mrs. Steele post-operatively on October 19, 2004, and again on December 14, 2004, at which point he noted no continued spinal fluid leak, reported that she "was doing well," notwithstanding her symptomology, and reported that she was released to return to sedentary employment.

22.     On January 18, 2005, Dr. Alemo saw Mrs. Steele again, noted that she was complaining of pain in her right leg, told her she could remove her back brace, and prescribed Neurontin, along with Percocet and advised her to return to work full-time.  At that time, Mrs. Steele was still suffering from considerable back and leg pain, as well as a cerebrospinal fluid leak.

23.     In February of 2005, Dr. Alemo saw Mrs. Steele again and noted that her back pain was constant and getting worse.

24.     In March of 2005, Mrs. Steele continued to complain of low back pain, pain in the area of the incision, and other problems relating to her surgery.

25.     An MRI was performed on April 28, 2005, which clearly demonstrated a post-operative fluid collection, with a pseudomeningocele that extended from the posterior aspect of the dural sac at the L5-S1 level, superiorly for length of 9.3cm.

26.     Despite the obvious presence of this spinal fluid leak and pseudomeningocele on MRI, Dr. Alemo did not even acknowledge it.

27.     On May 31, 2005, Dr. Alemo again saw Mrs. Steele, at which time she was continuing to complain of low back pain, pain radiating from the posterior aspect of her right leg and at times into her left leg.  Her leg pain was now worse than her back pain, and she could not walk more than one or two blocks.

28.     As of May 31, 2005, Dr.Alemo prescribed Neurontin three times a day and Oxycontin 10mg twice a day for Mrs. Steele.  Dr. Alemo's office note describes the recent MRI studies as demonstrating degenerative disk disease, but in no way mentions the pseudomeningocele and spinal fluid leak that was present and visible.

29.     As of May 31, 2005, Dr. Alemo had not acknowledged Mrs. Steele's ongoing spinal fluid leak or pseudomeningocele in any fashion, nor attempted to treat it.

30.     On June 20, 2005, Dr. Alemo attempted facet joint blocks bilaterally at the defendant, Nazareth Hospital. The facet joint blocks did not help, nor did they in any way address this large pseudomeningocele.

31.     On July 11, 2005, Mrs. Steele was again admitted to the defendant, Nazareth Hospital, where Dr. Alemo attempted epidural myelography as well as steroid injections. However, Dr. Alemo failed to inject the dye into the dura, and therefore the studies were reportedly not diagnostic.

32.     As of July 11, 2005, Dr. Alemo had still not acknowledged nor treated the spinal fluid leak and pseudomeningocele that had persisted in Mrs. Steele since her original surgery, and as was evidenced on her April 28, 2005, MRI.

33.     On August 1, 2005, Mrs. Steele was again admitted to the defendant Nazareth Hospital, during which admission Dr. Alemo again attempted myelography and performed bilateral facet joint blocks. The myelogram films and post-myelogram CT were reported by the radiologist at Nazareth Hospital as demonstrating a large meningocele containing contrast and air at L5-S1 posteriorly, extending upwards with its superior border at the spinous process of L2.

34.     On August 12, 2005, Mrs. Steele was admitted to defendant, Hahnemann University Hospital, where defendant, Dr. Alemo performed surgery upon her, with an attempted repair of the pseudomeningocele. Mrs. Steele was then discharged after one week, on August 19, 2005.

35.     This attempted repair of the pseudomeningocele was unsuccessful.

-6-

36.     On August 23, 2005, Dr. Alemo again saw Mrs. Steele, and noted that she continued to have bulging in her back, and suffered from painful complaints, and she was readmitted to defendant Hahnemann University Hospital the next day, August 24, 2005, where Dr. Alemo made numerous attempts to treat the spinal fluid leak, including three separate blood patches, placement of a lumbar drain which required two replacements, and other efforts.

37.     The lumbar drain was removed on September 2, 2005, and Mrs. Steele was discharged from defendant, Hahnemann University Hospital on September 3, 2005.

38.     Again, these efforts failed to repair the torn dura and pseudomeningocele, and Mrs. Steele's cerebrospinal fluid leak continued.

39.     Mrs. Steele's fluid leak and pseudomeningocele continued, and Dr. Alemo saw her post-operatively on September 7, 2005, but did not do anything further to treat this leak.

40.     An MRI taken on October 4, 2005, now one year after the original surgery, still demonstrated a large cerebrospinal fluid collection within the subcutaneous tissues of Mrs. Steele's spine.  At this point, Dr. Alemo drained 30cc's of fluid in his office.

41.     Dr. Alemo again drained spinal fluid from Mrs. Steele's back on October 11, 2005, and Mrs. Steele's symptoms, including back pain, leg pain, and severe headaches continued.

42.     On October 17, 2005, Mrs. Steele was again admitted to the defendant Nazareth Hospital, at which point Dr. Alemo again attempted to administer a blood patch under fluoroscopy.  Again, this attempted repair failed.

43.     On October 20, 2005, Mrs. Steele was admitted again to the defendant Nazareth Hospital for an attempted surgical repair of the pseudomeningocele by defendant, Dr. Alemo, this time attempting a repair utilizing a fat graft.  Dr. Alemo performed another spinal surgery on

Mrs. Steele including an additional laminectomy, and an attempted repair of the cerebrospinal fluid leak that had now been going on for more than one year.

44.   The attempted surgical repair on October 20, 2005 also failed.

45.   Defendant Alemo saw Mrs. Steele in his office again on November 15, 2005, at which point she still exhibited swelling of her back, and complained of pain in her back into her legs.  There was a subcutaneous fluid collection present, as the dura had still not been successfully repaired, and Mrs. Steele's cerebrospinal fluid leak continued.

46.   An MRI of the lumbar spine on November 16, 2005, was interpreted by a radiologist at defendant, Nazareth Hospital as demonstrating an increase in size of the post-operative cerebrospinal fluid collection when compared to the prior study of October 21, 2005.

47.   Nonetheless, on November 22, 2005, Mrs. Steele again presented to the defendant, Dr. Alemo, who reported that "the bulging in her back has subsided in size."  At that point, Dr. Alemo was now prescribing Oxycontin 40mg twice a day, Percocet 10mg every 8 hours, Xanax 0.5mg three times a day, Prozac 20mg twice a day, and Dr. Alemo further was considering the use of a Fentanyl patch in Mrs. Steele.

48.   Ultimately, Mrs. Steele left the care of the defendants, and presented to the emergency room of Thomas Jefferson University Hospital for treatment of the pseudomeningocele.

49.   On March 13, 2006, Mrs. Steele underwent surgery at Jefferson, performed by a neurosurgeon and an orthopedic surgeon, at which time the entire fusion that had been performed in October 2004 by Dr. Alemo was essentially redone.  The cage and pedicle screws were removed, the pseudomeningocele was repaired, and new bone grafting and instrumentation was placed.

50.    Following the procedure performed at Thomas Jefferson University Hospital, Mrs. Steele's cerebrospinal fluid leak and pseudomeningocele completely resolved.

51.    As a direct and proximate result of the conduct of the defendants as described more fully throughout this Complaint, Mrs. Steele suffered, and will continue to suffer, ongoing pain and discomfort in her back, legs, severe headaches, loss of enjoyment of life, inability to perform some of her activities of daily living, great mental anguish, pain, and suffering.

52.    As a direct and proximate result of the conduct of the defendants as set forth more fully throughout this Complaint, Mrs. Steele has incurred medical expenses and will continue to incur medical expenses indefinitely into the future.

53.    As a direct and proximate result of the conduct of the defendants as set forth more fully throughout this Complaint, Mrs. Steele suffered from a loss of earnings and earning capacity and will continue to suffer from such losses indefinitely into the future.

54.    During the same period of time that Mrs. Steele was subjecting herself to the negligent treatment of defendant, Dr. Alemo, the defendant hospitals, Nazareth and Hahnemann knew, or in the exercise of reasonable care should have known, that there were significant issues which called into question Dr. Alemo's competency to practice spinal surgery.

55.    At times relevant and material hereto, defendant, Hahnemann University Hospital, had a duty to appropriately review the credentials and qualifications of Dr. Alemo for purposes of determining whether or not to provide him with staff privileges and/or to reappoint him to the medical staff.

56.    Similarly, at all times relevant and material hereto, defendant Nazareth Hospital had a duty to properly investigate the qualifications and background of the defendant Dr. Alemo, in connection with their credentialing process. As part of that duty, they were obligated to

review the qualifications competence of Dr. Alemo, both in granting him privileges and when deciding whether to reappoint him to the medical staff.

57.    Notwithstanding information that was readily available to the defendant hospitals which called into question Dr. Alemo's competency to perform spinal surgery on patients, and raised significant issues pertaining to patient safety, the defendant hospitals appointed and continued to reappoint Dr. Alemo to the medical staff, and profited from the surgery that he performed in their institutions.

### Count I
### Negligence
### *Judith Steele v. All Defendants*

58.    All paragraphs of this Complaint are incorporated herein as if fully set forth at length.

59.    Mrs. Steele's injuries were caused by the negligence and carelessness of Dr. Alemo as set forth throughout this Complaint.

60.    The other defendants are vicariously liable for the negligence of Dr. Alemo, by virtue of their agency relationship with him, including but not limited to master/servant, employer/employee, principal/agent and/or principles of ostensible agency.

61.    The negligence and carelessness of Dr. Alemo includes:

    a.    failing to properly recognize and treat a spinal fluid leak in the Plaintiff;

    b.    failing to order appropriate studies so as to recognize and/or rule out an ongoing spinal fluid leak in the Plaintiff;

    c.    failing to properly read and/or acknowledge the reports or studies and actual films that demonstrated an ongoing spinal fluid leak in the Plaintiff;

    d.      negligently delaying in the treatment of an ongoing spinal fluid leak in the Plaintiff;

    e.      failing to recognize the signs and symptoms of a pseudomeningocele in the Plaintiff;

    f.      delaying in treating the Plaintiff's pseudomeningocele;

    g.      negligently failing to repair the Plaintiff's pseudomeningocele;

    h.      unnecessarily subjecting Plaintiff to multiple surgical procedures and failed repair attempts of the pseudomeningocele;

    i.      negligently advising Plaintiff to resume normal activities and return to work when she had in fact, an ongoing cerebrospinal fluid leak and large pseudomeningocele;

    j.      failing to properly consult with reasonably trained professionals and specialists who were competent to repair Plaintiff's pseudomeningocele when it became apparent that this condition was beyond his own competence; and

    k.      subjecting the Plaintiff to unnecessary and unreasonable procedures that were not reasonably calculated to improve her condition.

62.    As a direct and proximate result of the foregoing negligence and carelessness of the defendants as set forth more fully throughout this Complaint, Plaintiff, Judith Steele has suffered those damages detailed within the Complaint.

WHEREFORE, Plaintiff, Judith Steele, demands judgment in her favor and against all defendants, jointly and severally, for a sum in excess of the jurisdictional limits for arbitration, together with interest and costs.

**Count II**
**Corporate Negligence**
*Judy Steele v. Hahnemann University Hospital, Tenet Healthsystem Hahnemann, LLC*

63.    All paragraphs of this Complaint are incorporated herein as if fully set forth at length.

64.    At all times relevant and material hereto, defendant, Hahnemann University Hospital, Tenet Healthsystem Hahnemann, LLC, had certain nondelegable duties which they owed directly to Mrs. Steele.

65.    These nondelegable duties included:

    a.    the selection and retention of only competent physicians;

    b.    overseeing all persons who practice medicine within the hospital walls as to patient care; and

    c.    formulating, adopting, and enforcing adequate rules and policies to ensure quality care for patients.

66.    As set forth throughout this Complaint, the defendant Hahnemann University Hospital, Tenet Healthsystem Hahnemann, LLC, breached those duties which they owed to their patient, Mrs. Steele. As a consequence Mrs. Steele suffered serious damages as more fully detailed herein.

67.    At all times relevant and material hereto, defendant Hahnemann University Hospital, Tenet Healthsystem Hahnemann, LLC, (hereinafter "Hahnemann") possessed or should have possessed actual and substantial knowledge which raised serious questions concerning Dr. Alemo's experience and competency in performing spinal surgery upon patients, and in performing instrumented spinal fusion surgeries in particular. Moreover, the defendant had or should have had actual and substantial knowledge concerning a higher than average incidence of

post-operative complications and adverse outcomes, and Dr. Alemo's failure to recognize and treat these complications in a timely manner.

68.     Specifically, Dr. Alemo had been named as a defendant in more than twenty-five (25) lawsuits prior to the date of his treatment of the Plaintiff herein, in which his competency and performance in spinal surgery had been seriously questioned, and in which board certified experts had provided written opinions that Dr. Alemo's care in these subject cases had deviated from the accepted standard of medical care.

69.     In a significant number of these cases, there was either a substantial verdict against Dr. Alemo, and/or a substantial cash settlement paid to the Plaintiff/Patient, thereby resolving the claims of negligence and substandard care against Dr. Alemo.

70.     Cases in which Dr. Alemo was determined, by verdict or award to have been negligent and/or which in some fashion settled claims of negligence against Dr. Alemo, included but are not limited to:

     a.    *Nogowski v. Alemo*, Philadelphia CCP, No. 88-02-01555 in which an award was entered against Dr. Alemo for leaving a sponge inside a patient during a decompressive lumbar laminectomy;

     b.    *Ortiz v. Alemo*, Philadelphia CCP, No. 90-12-00281 which settled for approximately $1.1 million;

     c.    *Tores v. Alemo*, Philadelphia CCP, No. 91-02-05608 which settled for approximately $525,000.00;

     d.    *Calli v. Alemo, M.D.*, Philadelphia CCP, No. 97-251 which resulted in a jury verdict against Dr. Alemo in the amount of $22.4 million, and arose from his inept placement of lumbar instrumentation during a fusion

procedure of a patient, and subsequent mismanagement of post-operative
complications, including but not limited to a cerebral spinal fluid leak;

e.    *O'Donnell v. Alemo, M.D.*, Philadelphia CCP, No. 00-00-004254 which
settled for a confidential sum and which involved Dr. Alemo's
mismanagement of a cerebral spinal fluid leak resulting in a patient
suffering from spinal meningitis;

f.    *Fitzgerald v. Alemo, M.D.*, Philadelphia CCP, No. 92-08-04342 which
resulted in a jury verdict against Dr. Alemo for approximately $1.8
million;

g.    *Jones v. Alemo*, Philadelphia CCP, No. 93-03-04301 which involved a
lumbar spinal decompressive surgery performed by Dr. Alemo in which he
left a sponge inside the patient (again);

h.    *Levin v. Alemo*, Philadelphia CCP, No. 95-05-01017 which involved a
performance of a laminectomy by Dr. Alemo where (once again) he left a
sponge inside a patient;

i.    *Mercado v. Alemo, M.D.*, Philadelphia CCP, No. 99-10-01065 which
involved a decompressive lumbar laminectomy at L4-5, which resulted in
a cerebral spinal fluid leak which was mismanaged by Dr. Alemo. This
case settled for a confidential amount; and

j.    *Green v. Alemo, M.D.*, Philadelphia CCP, No. 02-02-01552, in which Dr.
Alemo lacerated and failed to repair a patient's trachea during a cervical
spine surgery. This case also settled with a substantial sum paid on behalf
of Dr. Alemo.

71.     It is averred upon information and belief that the defendant, Hahnemann, possessed or should have possessed information on more than twenty (20) cases involving Dr. Alemo in which there was reasonable evidence that Dr. Alemo failed to act in the fashion expected and required of a competent neurosurgeon.

72.     Notwithstanding this information, which would cause any reasonable person to question Dr. Alemo's skill and competency as a practicing neurosurgeon, defendant, Hahnemann, granted and continued to grant Dr. Alemo surgical privileges which permitted him to perform neurosurgical procedures within the walls of Hahnemann University Hospital, and permitted him to perform those procedures in the absence of further oversight or supervision as should have been required.

73.     Repeatedly, during the course of the credentialing process at Hahnemann University Hospital, Dr. Alemo provided incomplete information, and/or provided misleading information on his applications for staff privileges and for reappointment of privileges.

74.     In the exercise of reasonable care, defendant Hahnemann would and should have recognized the incomplete and misleading information and prevented Dr. Alemo's reappointment.

75.     Instead, defendant Hahnemann "rubber-stamped" his reappointment, without any regard to the actual facts, ignoring the facial inconsistencies contained in Dr. Alemo's applications, and without any concern for the safety of patients.

76.     Defendant Hahnemann profited from their own neglect, as over the years Dr. Alemo performed hundreds of surgeries on patients at Hahnemann for which Hahnemann was paid substantial sums of money.

77.    More specifically, and by way of example, in March of 1994, defendant Hahnemann's application for reappointment given to Alemo inquired as to the existence of malpractice claims and/or settlements.

78.    In response, Dr. Alemo identified nine claims against him. One month earlier, Dr. Alemo's insurance company, Physicians Insurance Company, provided a claims history to Hahnemann which identified cases that were not disclosed by Dr. Alemo.

79.    Without any further description of the claims as required, and despite the inconsistent information supplied by Dr. Alemo's own insurance company, Hahnemann University Hospital conducted no further investigation and simply reappointed Dr. Alemo to the staff.

80.    In 1996, Dr. Alemo again sought reappointment.

81.    Again, Hahnemann's application for reappointment made inquiry into professional liability claims, settlements, and judgments. On this application, Dr. Alemo again indicated that there had been claims filed and/or settled against him within the last five years, but simply left all other requests for information and questions about those claims blank.

82.    Dr. Alemo did not provide any description nor identification of the claims against him on the reappointment application in 1996.

83.    In connection with that 1996 application, defendant Hahnemann again conducted no further investigation whatsoever into Dr. Alemo's malpractice history, and Hahnemann did not require Dr. Alemo to complete his application. Instead, they simply approved him and reappointed him to the medical staff.

84.    Again, in 1997, Dr. Alemo was presented with another application for reappointment by the defendant Hahnemann.

-16-

85.    Again, in 1997, Dr. Alemo was asked to provided detailed information pertaining to malpractice actions pending against him and/or that had settled.

86.    In response to these questions, Dr. Alemo only identified a single case involving a patient named Dennis Richardson. No other cases were identified nor discussed, and no information was provided as to what happened to the roughly thirteen other cases identified previously by Dr. Alemo's insurance carrier, and no description of the *Richardson* case was provided.

87.    Defendant Hahnemann again conducted no investigation into these discrepancies and incomplete responses, and once again simply reappointed Dr. Alemo to the medical staff.

88.    In the year 2000, Dr. Alemo again submitted an application for reappointment to defendant Hahnemann. Again, in this application, Dr. Alemo responded affirmatively to questions indicating that he had been a defendant in malpractice suits within the last five (5) years, and that he currently had such cases pending against him. In that application, Dr. Alemo identified a single case, *Mercado*, and again did not provide any description of the case such that it could be reasonably investigated.

89.    Moreover, notwithstanding the fact that Dr. Alemo had a verdict in the amount of $22.4 million against him in a malpractice case during the preceding year which was televised on the evening news, that case (*Calli v. Alemo, M.D.*) was not identified at all.

90.    Again, defendant Hahnemann took no action to investigate any cases pending against Dr. Alemo nor did they require Dr. Alemo to complete his application in 2000.

91.    Defendant Hahnemann further never followed-up on the thirteen other cases that had been identified, and had no idea what happened to those patients or what the results of were of those lawsuits.

92.     Defendant Hahnemann simply reappointed Dr. Alemo to the medical staff again in the year 2000.

93.     On April 16, 2002, Dr. Alemo submitted another application for reappointment to the defendant Hahnemann.  On that application, he indicated that in the past two years, he had been a defendant in malpractice/professional liability suits, and that he currently has such cases pending against him.

94.     Accordingly, the 2002 application again requested that Dr. Alemo complete a claim/suit history addendum, which on its face required Dr. Alemo to summarize circumstances surrounding each claim, including a narrative description, adequate clinical detail, description of his care and treatment, the patient's condition and diagnosis, dates and description of treatment rendered, and the condition of the patient subsequent to treatment.

95.     Again, none of the information requested about these cases was submitted or supplied by Dr. Alemo whatsoever.

96.     Again, defendant Hahnemann made no effort to request more information from Dr. Alemo and made no effort to investigate these claims.

97.     At the time, defendant Hahnemann further possessed information from the National Practitioner Databank which on its face was inconsistent with the information that Dr. Alemo had previously supplied.

98.     Again, defendant Hahnemann made no further effort to determine the status or disposition of the professional malpractice cases pending against Dr. Alemo.

99.     Instead, defendant Hahnemann simply accepted Dr. Alemo's incomplete application and again granted him reappointment.

-18-

100.   This pattern of rubber-stamping Dr. Alemo's applications for reappointment continued, in reckless disregard for the safety of patients and the significance of the credentialing process.

101.   In fact, in September of 2004, before Mrs. Steele's initial surgery by Dr. Alemo, defendant Hahnemann was named as a defendant in a case, *Boka v. Alemo, M.D. and Hahnemann University Hospital*, in which it was alleged that defendant Hahnemann had failed to adequately investigate Dr. Alemo's credentials, and in which it was alleged that Dr. Alemo had been a defendant in multiple malpractice cases, identifying those cases by name, and further identifying verdicts against Dr. Alemo and settlements in which Dr. Alemo paid money. Notwithstanding the fact reasonable investigation would have demonstrated the presence of these cases, and would have demonstrated that Dr. Alemo had blatantly failed to report them repeatedly on his applications for privileges over the course of a decade, no action was taken against Dr. Alemo for roughly another fifteen months.

102.   Similarly, in December of 2004, Hahnemann was again sued with Dr. Alemo, in another case, *Coltrane v. Alemo, et al.*, in which it was asserted that Dr. Alemo was negligent in the performance of spinal surgery, and in which it was further alleged that Hahnemann had failed to properly credential him.

103.   In the interim, Dr. Alemo proceeded to treat numerous patients, including Judith Steele, with disastrous results.

104.   Finally, in December 2005, defendant Hahnemann University Hospital suspended Dr. Alemo as a consequence of his failing to provide complete and accurate information in his applications pertaining to his substantial claim history, and specifically as a result of the issues and information that was brought to defendant Hahnemann's attention in the *Boka* case.

-19-

105.    However, defendant Hahnemann permitted Dr. Alemo to serve a 31 day suspension on his vacation days, and on days when he was not otherwise operating so that there was no adverse pecuniary impact upon the defendant Hahnemann or Dr. Alemo.

106.    Defendant, Hahnemann's inaction and failure to formulate, adopt and enforce reasonable credentialing procedures placed Mrs. Steele and other patients of Dr. Alemo's at considerable risk.

107.    Mrs. Steele's injuries were caused by the negligence and carelessness of the defendant, Hahnemann, in the following particular respects:

a.    failing to recognize and investigate the numerous malpractice claims filed by patients of Dr. Alemo;

b.    failing to limit Dr. Alemo's privileges in light of the consistent history of substandard medical care provided by Dr. Alemo;

c.    failing to formulate appropriate standards for the credentialing of physicians;

d.    improperly granting employment and/or staff privileges to Dr. Alemo when it knew or should have known that he posed a risk of harm to patients should such privileges be granted;

e.    failing to adequately monitor and evaluate the performance of Dr. Alemo on a regular basis to ensure that he was providing safe and acceptable care to patients within the hospital walls;

f.    failing to limit, deny, suspend, terminate, or modify Dr. Alemo's privileges in light of his history;

g.     failing to oversee the practice and quality of medical care provided by Dr. Alemo; and

h.     failing to formulate, adopt and enforce adequate rules and policies to ensure quality care for its patients.

108.    The conduct of the defendant, Hahnemann University Hospital, Tenet Healthsystem Hahnemann, LLC, constitutes a pattern of reckless disregard for patient safety when it came to investigating or ensuring the competency of its medical staff. The reckless disregard exhibited by defendant Hahnemann over this ten (10) year period as described throughout this Complaint is of the sort that warrants the imposition of punitive damages.

109.    As a direct and proximate result of the independent negligence of the defendant, Hahnemann, Plaintiff has suffered damages as set forth more fully throughout this Complaint.

WHEREFORE, Plaintiff, Judith Steele, demands judgment in her favor and against defendant, Hahnemann, Hahnemann University Hospital, Tenet Healthsystem Hahnemann, LLC, jointly and severally, for both compensatory and punitive damages, in a sum in excess of the jurisdictional limits of arbitration, together with interests and costs.

### Count III
### CORPORATE NEGLIGENCE
*Judith Steele v. Nazareth Hospital*

110.    Plaintiffs specifically incorporate by reference all paragraphs of this Complaint as though the same were set forth fully at length herein.

111.    The defendant, Dr. Alemo, joined the hospital staff at defendant Nazareth Hospital in 2003. At that time and thereafter, the defendant Nazareth Hospital, held itself out on

its website as an institution that is "a foundation of innovation, caring, compassion, service and clinical excellence."

112.    On its website, Nazareth Hospital further advertised that it is part of Mercy Health System and that "Mercy Healthsystem and its care units are committed to providing the highest quality and safest care for each patient."

113.    When defendant, Dr. Alemo, joined the medical staff of defendant Nazareth Hospital, defendant Nazareth Hospital placed his name and photo on one of their web pages and stated "Nazareth Hospital is proud to recommend the physicians on our medical staff," on the same page below Dr. Alemo's photo and name.

114.    Defendant Nazareth Hospital failed in their duties owed to Nazareth patients treated by Dr. Alemo.

115.    These nondelegable duties included:

     a.    the selection and retention of only competent physicians;

     b.    overseeing all persons who practice medicine within the hospital walls as to patient care; and

     c.    formulating, adopting, and enforcing adequate rules and policies to ensure quality care for patients.

116.    As set forth throughout this Complaint, the defendant Nazareth Hospital, breached those duties which they owed to their patient, Mrs. Steele. As a consequence Mrs. Steele suffered serious damages as more fully detailed herein.

117.    At all times relevant and material hereto, defendant Nazareth Hospital possessed or should have possessed actual and substantial knowledge which raised serious questions concerning Dr. Alemo's experience and competency in performing spinal surgery upon patients,

and in treating spinal surgery patients.  Moreover, the defendant had or should have had actual
and substantial knowledge concerning a higher than average incidence of post-operative
complications and adverse outcomes, and Dr. Alemo's failure to recognize and treat these
complications in a timely manner.

118.    Specifically, Dr. Alemo had been named as a defendant in more than twenty-five
(25) lawsuits prior to the date Nazareth afforded him staff privileges, and in each case his
competency and performance in spinal surgery had been seriously questioned, and in each, board-
certified experts had provided written opinions that Dr. Alemo's care in these subject cases had
deviated from the accepted standard of medical care.

119.    In a significant number of these cases, there was either a substantial verdict
against Dr. Alemo, and/or a substantial cash settlement paid to the Plaintiff/Patient, thereby
resolving the claims of negligence and substandard care against Dr. Alemo.

120.    Cases in which Dr. Alemo was determined, by verdict or award to have been
negligent and/or which in some fashion settled claims of negligence against Dr. Alemo, included
but are not limited to:

      a.    *Nogowski v. Alemo*, Philadelphia CCP, No. 88-02-01555 in which an
award was entered against Dr. Alemo for leaving a sponge inside a patient
during a decompressive lumbar laminectomy;

      b.    *Ortiz v. Alemo*, Philadelphia CCP, No. 90-12-00281 which settled for
approximately $1.1 million;

      c.    *Tores v. Alemo*, Philadelphia CCP, No. 91-02-05608 which settled for
approximately $525,000.00;

d.   *Calli v. Alemo, M.D.*, Philadelphia CCP, No. 97-251 which resulted in a
jury verdict against Dr. Alemo in the amount of $22.4 million, and arose
from his inept placement of lumbar instrumentation during a fusion
procedure of a patient, and subsequent mismanagement of post-operative
complications, including but not limited to a cerebral spinal fluid leak;

e.   *O'Donnell v. Alemo, M.D.*, Philadelphia CCP, No. 00-00-004254 which
settled for a confidential sum and which involved Dr. Alemo's
mismanagement of a cerebral spinal fluid leak resulting in a patient
suffering from spinal meningitis;

f.   *Fitzgerald v. Alemo, M.D.*, Philadelphia CCP, No. 92-08-04342 which
resulted in a jury verdict against Dr. Alemo for approximately $1.8
million;

g.   *Jones v. Alemo*, Philadelphia CCP, No. 93-03-04301 which involved a
lumbar spinal decompressive surgery performed by Dr. Alemo in which he
left a sponge inside the patient (again);

h.   *Levin v. Alemo*, Philadelphia CCP, No. 95-05-01017 which involved a
performance of a laminectomy by Dr. Alemo where (once again) he left a
sponge inside a patient;

i.   *Mercado v. Alemo, M.D.*, Philadelphia CCP, No. 99-10-01065 which
involved a decompressive lumbar laminectomy at L4-5, which resulted in
a cerebral spinal fluid leak which was mismanaged by Dr. Alemo. This
case settled for a confidential amount; and

-24-

j.     *Green v. Alemo, M.D.*, Philadelphia CCP, No. 02-02-01552, in which Dr.

Alemo lacerated and failed to repair a patient's trachea during a cervical

spine surgery. This case also settled with a substantial sum paid on behalf

of Dr. Alemo.

121.    It is averred upon information and belief that the defendant, Nazareth Hospital

possessed or should have possessed information on more than twenty (20) case involving Dr.

Alemo in which there was reasonable evidence that Dr. Alemo failed to act in the fashion

expected and required of a competent neurosurgeon.

122.    Notwithstanding this information, which would cause any reasonable person to

question Dr. Alemo's skill and competency as a practicing neurosurgeon, defendant, Nazareth,

granted and continued to grant Dr. Alemo surgical privileges which permitted him to perform

neurosurgical procedures within the walls of Nazareth Hospital, and permitted him to perform

those procedures in the absence of further oversight or supervision as should have been required.

123.    Defendant, Nazareth's inaction and failure formulate, adopt and enforce

reasonable credentialing procedures placed Mrs. Steele and other patients of Dr. Alemo's at

considerable risk.

124.    Mrs. Steele's injuries were caused by the negligence and carelessness of the

defendant, Nazareth Hospital, in the following particular respects:

a.     failing to recognize and investigate the numerous malpractice claims filed

by patients of Dr. Alemo;

b.     failing to limit Dr. Alemo's privileges in light of the consistent history of

substandard medical care provided by Dr. Alemo;

c.      failing to formulate appropriate standards for the credentialing of
        physicians;

d.      improperly granting employment and/or staff privileges to Dr. Alemo
        when it knew or should have known that he posed a risk of harm to
        patients should such privileges be granted;

e.      failing to adequately monitor and evaluate the performance of Dr. Alemo
        on a regular basis to ensure that he was providing safe and acceptable care
        to patients within the hospital walls;

f.      failing to limit, deny, suspend, terminate, or modify Dr. Alemo's
        privileges in light of his history;

g.      failing to oversee the practice and quality of medical care provided by Dr.
        Alemo; and

h.      failing to formulate, adopt and enforce adequate rules and policies to
        ensure quality care for its patients.

125.    As a direct and proximate result of the independent negligence of the defendant,
Nazareth, Plaintiff has suffered damages as set forth more fully throughout this Complaint.

        WHEREFORE, Plaintiff, Judith Steele, demands judgment in her favor and
against defendant, Nazareth Hospital, jointly and severally, for compensatory damages, in a sum
in excess of the jurisdictional limits of arbitration, together with interests and costs.

### Count IV
#### *Timothy Steele v. All Defendants*

126.    Plaintiff hereby incorporates all paragraphs of this Complaint as though the same
were set forth more fully at length herein.

-26-

127.    At all times relevant and material hereto, Timothy Steele was the husband of Plaintiff, Judith Steele.

128.    As a direct and proximate result of the liability producing conduct of the defendants as set forth more fully throughout this Complaint, Plaintiff Timothy Steele has been deprived of the consortium, companionship, services, and society of his wife, and is entitled to recover against defendants for those losses.

129.    As a direct and proximate result of the conduct of the defendants as set forth more fully throughout this Complaint, Plaintiff Timothy Steele has suffered a loss of monies, including those expended for medical expenses, and time lost from work, in an effort to care for and treat his wife for the injuries caused by the defendants.

WHEREFORE, Plaintiff, Timothy Steele, demands judgment in his favor and against all defendants, jointly and severally, for a sum in excess of the jurisdictional limits for arbitration, together with interest and costs.

Mark W. Tanner, Esquire

Date:    November 6, 2006

-27-

## VERIFICATION

The undersigned, having read the foregoing Complaint, verifies that the document is based on information furnished to counsel, which information has been gathered by counsel in the course of this lawsuit. The language of the pleading is that of counsel, and not of the undersigned. The undersigned verifies that he/she has read the foregoing and that it is true and correct to the best of the undersigned's knowledge, information and belief. To the extent the contents of the foregoing document are that of counsel, the undersigned has relied upon counsel in taking this verification. This verification is made subject to the penalties of 18 Pa.C.S.A. §4904 relating to unsworn falsification to authorities.

_Judith Steele_

## VERIFICATION

The undersigned, having read the foregoing Complaint, verifies that the document is based on information furnished to counsel, which information has been gathered by counsel in the course of this lawsuit. The language of the pleading is that of counsel, and not of the undersigned. The undersigned verifies that he/she has read the foregoing and that it is true and correct to the best of the undersigned's knowledge, information and belief. To the extent the contents of the foregoing document are that of counsel, the undersigned has relied upon counsel in taking this verification. This verification is made subject to the penalties of 18 Pa.C.S.A. §4904 relating to unsworn falsification to authorities.

Timothy Steele

## CERTIFICATE OF SERVICE

I, Mark W. Tanner, Esquire, hereby certify that I caused a true and correct copy of the foregoing Complaint to be served via regular mail on the following:

Timothy McCann, Esquire
June Taima, Esquire, Esquire
McCann & Geschke
1800 JFK Boulevard, Suite 801
Philadelphia, PA 19103

Saeid Alemo, MD
2630 Holme Avenue, Suite 103
Philadelphia, PA 19152

University Neurosurgical PC
2630 Holme Avenue, Suite 103
Philadelphia, PA 19152

Alemo's Neurological & Neurosurgical Association, PC
2630 Holme Avenue, Suite 103
Philadelphia, PA 19152

Nazareth Hospital
2601 Holme Avenue
Philadelphia, PA 19152


Mark W. Tanner, Esquire

Date:    November 6, 2006

-28-