# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

BOILERMAKERS NATIONAL HEALTH )
AND WELFARE TRUST; BOARD OF )
TRUSTEES OF THE BOILERMAKERS )
NATIONAL HEALTH AND WELFARE )
TRUST, )
    )
        Plaintiffs, )
    )   **CASE NO.: 2:09-CV-02329-JAR-DJW**
    vs. )
    )   **PLAINTIFFS' BRIEF IN OPPOSITION**
    )   **TO DEFENDANTS' MOTION TO**
JUDITH A. STEELE; TIMOTHY STEELE; )   **DISMISS FOR LACK OF PERSONAL**
MARK TANNER; FELDMAN, SHEPERD, )   **JURISDICTION, TO DISMISS FOR**
WOHLGELERNTER, TANNER, )   **FAILURE TO STATE A CLAIM UPON**
WEINSTOCK AND DODIG )   **WHICH RELIEF CAN BE GRANTED, OR**
    )   **IN THE ALTERNATIVE, TO TRANSFER**
        Defendants. )   **VENUE**
    )
    )
_____ )

COMES NOW, Plaintiffs, by and through counsel and pursuant to D.Kan. Rule 7.1(c)

and files this *Brief in Opposition to Defendants' Motion to Dismiss for Lack of Personal*

*Jurisdiction, to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted, or in*

*the Alternative, to Transfer Venue.*

## INTRODUCTION

Plaintiffs, the Boilermakers National Health and Welfare Trust and its Board of Trustees

(hereinafter collectively, "Trust") have filed this action to enforce the terms of the Boilermakers

National Health and Welfare Fund's Plan M (hereinafter "The Plan") and for equitable relief

arising under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§

1001, et seq.  Specifically, the Trust seeks equitable relief under 29 U.S.C. § 1132(a)(3),

including, but not limited to, restitution, imposition of a constructive trust, and declarations of

rights under the Plan against Defendants to enforce ERISA and the terms of the Plan.  On July

1

20, 2009, Defendant filed a *Motion to Dismiss for Lack of Personal Jurisdiction, to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted, or in the Alternative, to Transfer Venue* and memorandum in support thereof.

## STATEMENT OF FACTS

1.     Mr. Timothy Steele is a member of the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers, AFL-CIO Local Lodge No. 13. Mr. Steele obtained health care coverage for his family through the Boilermakers National Health and Welfare Trust (hereinafter, "Trust") which provides benefits through the Boilermakers National Health and Welfare Plan M (hereinafter, "Plan M"). (Doc. 17, Paragraph 2).

2.     The General Limitations and Exclusions section of the Plan under Article X, Section 3 provides:

> The Funds shall pay benefits only on the condition that the Eligible Individual or another duly authorized person on his behalf shall:
>
> (a)     Reimburse the Fund to the extent of benefits provided by the Fund (including any amounts credited to deductibles), immediately upon receipt of compensation of any kind, whether by judgment, compromise, settlement or otherwise, for damages which include, but are not limited to, personal injury, property loss or medical expenses. The Eligible Individual's heirs, beneficiaries and personal representatives shall likewise be bound by this obligation. Provide the Fund a lien to the extent of benefits provided by the Fund (including any amounts credited to deductibles), in the compensation for damages recovered, or to be recovered, by the Eligible Individual, or by his heirs, beneficiaries or personal representatives in case of his death, on account of his injury or illness.

(Exhibit 1, Affidavit of Pamela S. Dumler, ¶ 4).

2

3.    As a result of medical malpractice, Ms. Steele suffered a spinal cord injury in 2005. The Trust paid medical bills arising from the malpractice. (Doc. 17, Paragraph 2).

4.    According to records kept by the Trust in the ordinary course of business, in total, the Trust paid for claims relating to the medical malpractice in the amount of five hundred thirty thousand four hundred fifty-two dollars and fifty-two cents ($530,452.52), excluding prescription drug costs. (Exhibit 1, Affidavit of Pamela S. Dumler, ¶ 5). One hundred thirty-four (134) claims were submitted to the Trust relating to the malpractice. (Exhibit 1, Affidavit of Pamela S. Dumler, ¶ 5).

5.    According to records kept by the Trust in the ordinary course of business, Defendant Judith Steele sent the Trust a signed "Subrogation Information Sheet" in which Ms. Steele indicated that she had a back injury and had retained counsel to represent her in the matter. (Exhibit 1, Affidavit of Pamela S. Dumler, ¶ 6).

6.    According to records kept by the Trust in the ordinary course of business, on or about May 19, 2006, the Trust sent correspondence to Defendant Mark Tanner informing him that Ms. Steele had submitted a "Claims Information Sheet" to the Trust and requesting that Attorney Tanner respond to the Trust and indicate whether a lawsuit had been filed and the status of the case, as well as whether the Steeles would be willing to protect the Trust's subrogation interest. (Exhibit 1, Affidavit of Pamela S. Dumler, ¶ 7).

7.    According to records kept by the Trust in the ordinary course of business, on or about May 25, 2006, Plaintiff Mark Tanner sent correspondence to the Trust advising the Trust that no lawsuit had been filed regarding Ms. Steele's claims, and requesting information about the Trust's subrogation interest. (Exhibit 1, Affidavit of Pamela S. Dumler, ¶ 8).

3

8.     According to records kept by the Trust in the ordinary course of business, on or about July 12, 2006, an attorney for the Steeles telephoned the Trust and informed a representative of the Trust that the Steeles were considering filing a medical malpractice suit. (Exhibit 1, Affidavit of Pamela S. Dumler, ¶ 9).

9.     According to records kept by the Trust in the ordinary course of business, on or about July 12, 2006, the Trust sent correspondence to Defendant Timothy Steele to inform him that a claims examiner spoke to Attorney Tanner, and that if Mr. Steele hired an attorney, filed a lawsuit, or accepted settlement relating to the malpractice claim, the Fund must be notified immediately. The Trust also sent Mr. Steele the pertinent portions of the Trust's Summary Plan Description that described the Trust's right of subrogation and reimbursement. The Trust sent Mr. Tanner a copy of the July 12, 2006 correspondence. (Exhibit 1, Affidavit of Pamela S. Dumler, ¶ 10).

10.     According to records kept by the Trust in the ordinary course of business, on or about October 31, 2006, the Trust sent correspondence to Mr. Tanner inquiring as to the status of the investigation of services provided to Ms. Steele. (Exhibit 1, Affidavit of Pamela S. Dumler, ¶ 11).

11.     In late 2006, Mr. and Mrs. Steele filed a medical malpractice lawsuit in the Philadelphia County Court of Common Pleas (hereinafter, "Pennsylvania Medical Malpractice Action"). (Exhibit 1, Affidavit of Pamela S. Dumler, ¶ 12).

12.     According to records kept by the Trust in the ordinary course of business, on or about November 15, 2006, Defendant Mark Tanner sent the Trust a copy of the Complaint in the Pennsylvania Medical Malpractice Action. (Exhibit 1, Affidavit of Pamela S. Dumler, ¶ 12).

13.     According to records kept by the Trust in the ordinary course of business, on or about January 8, 2007, Defendant Judith Steele telephoned the Trust.  (Exhibit 1, Affidavit of Pamela S. Dumler, ¶ 13).

14.     According to records kept by the Trust in the ordinary course of business, on or about January 9, 2007, Defendant Mark Tanner sent correspondence to the Trust regarding the January 8, 2007 conversation, claims filed on behalf of Mr. and Mrs. Steele and informing the Trust that he had attempted to contact the Trust on numerous occasions, but the calls resulted in a busy signal. (Exhibit 1, Affidavit of Pamela S. Dumler, ¶ 14).

15.     According to records kept by the Trust in the ordinary course of business, on or about January 12, 2007, the Trust sent correspondence to Defendant Mark Tanner, with a copy to Mr. Steele, in which the Trust included copies of a Summary Plan Description, an amendment relating to the Trust's subrogation and reimbursement rights, and a list of claims paid by the Trust in relation to the Pennsylvania Medical Malpractice Action. (Exhibit 1, Affidavit of Pamela S. Dumler, ¶ 15).

16.     According to records kept by they Trust in the ordinary course of business, on or about January 16, 2007, Defendant Mark Tanner sent correspondence to the Trust in which he indicated that he did not represent the Trust and requested the authority upon which the Trust based its subrogation and reimbursement rights. (Exhibit 1, Affidavit of Pamela S. Dumler, ¶ 16).

17.     On or about May 17, 2007, counsel for the Trust sent Defendant Tanner correspondence again asserting the subrogation and reimbursement rights of the Trust and inquiring as to whether the Steeles would agree to protect the Trust's subrogation and reimbursement interest. (Exhibit 2, Affidavit of Lauren M. Fletcher, ¶ 4). A copy of Ms. Lauren

M. Fletcher's affidavit is attached hereto as Exhibit 2. Counsel for the Trust did not receive a written response to its correspondence. (Exhibit 2, Affidavit of Lauren M. Fletcher, ¶ 4).

18. On or about February 29, 2008, the Benjamin Eisner, local counsel for the Trust, filed a *Petition to Intervene* in the Pennsylvania Medical Malpractice Action and a memorandum in support. (Exhibit 2, Affidavit of Lauren M. Fletcher, ¶ 5).

19. On or about March 17, 2008, Defendant Mark Tanner submitted a brief in opposition to the Trust's *Petition for Intervention* in the Pennsylvania Medical Malpractice Action. (Exhibit 2, Affidavit of Lauren M. Fletcher, ¶ 6).

20. On or about May 20, 2008, the Judge denied the Trust's *Petition for Intervention* without comment. (Exhibit 2, Affidavit of Lauren M. Fletcher, ¶ 7).

21. On or about June 24, 2008, counsel for the Trust sent Defendant Tanner correspondence in which the Trust again asserted its subrogation and reimbursement rights. Counsel for the Trust also reminded Defendant Tanner that the Steeles had a continuing obligation to notify the Plan in writing whenever prior to settling the Pennsylvania Medical Malpractice Action. (Exhibit 2, Affidavit of Lauren M. Fletcher, ¶ 8).

22. On or about December 3, 2008, counsel for the Trust sent Defendant Tanner correspondence again explaining the Trust's position regarding its reimbursement rights and declining Attorney Tanner's invitation to submit a brief on the Trust's behalf in the Pennsylvania Medical Malpractice Action in response to a *Motion in Limine* filed by the Pennsylvania Medical Malpractice Action's defendants. (Exhibit 2, Affidavit of Lauren M. Fletcher, ¶ 9).

23. On or about December 4, 2008, Defendant Tanner sent correspondence to Attorney Benjamin Eisner, local counsel for the Trust, in which he stated the Steele's position on

the Trust's reimbursement rights and included a settlement proposal. (Exhibit 2, Affidavit of Lauren M. Fletcher, ¶ 10).

24.     On or about February 23, 2009, counsel for the Trust and Defendant Mark Tanner spoke via the telephone regarding the Trust's settlement position in relation to its subrogation and reimbursement rights. (Exhibit 2, Affidavit of Lauren M. Fletcher, ¶ 11).

25.     On or about February 25, 2009, counsel for the Trust sent correspondence to Defendant Tanner memorializing the February 23, 2009 described above. (Exhibit 2, Affidavit of Lauren M. Fletcher, ¶12).

26.     On or about March 5, 2009, Defendant Mark Tanner sent correspondence to counsel to the Trust. (Exhibit 2, Affidavit of Lauren M. Fletcher, ¶ 13).

27.     On or about May 29, 2009, counsel for the Trust sent Defendant Tanner a settlement proposal. (Exhibit 2, Affidavit of Lauren M. Fletcher, ¶ 14).

28.     On or about June 4, 2009, the Pennsylvania Medical Malpractice Action settled. (Doc. 17, Paragraph 3.)

29.     Defendants Mark Tanner and Feldman Shepherd are currently holding in escrow amounts received by Judith and Timothy Steele in settlement for the Philadelphia Medical Malpractice Action. (Doc. 17, Paragraph 20.)

30.     On or about June 9, 2009, Defendant Mark Tanner sent correspondence to counsel for the Trust in which he denied the Trust had reimbursement and subrogation rights and threatened to sue Blake & Uhlig, P.A. and the Trust. (Exhibit 2, Affidavit of Lauren M. Fletcher, ¶ 15).

31.     On June 17, 2009, counsel for the Trust sent correspondence to Defendant Mark Tanner notifying him that the Trust had no choice but to take further legal action against

7

Attorney Tanner and the Steeles in the District of Kansas. (Exhibit 2, Affidavit of Lauren M. Fletcher, ¶ 16).

32.   On June 18, 2009, Plaintiffs filed this lawsuit. (Doc. 1)

33.   On June 24, 2009, Defendants Judith and Timothy Steele, after the Fund commenced the present action, and prior to filing its *Motion to Dismiss for Lack of Personal Jurisdiction, to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted, or in the Alternative, to Transfer Venue*, filed a lawsuit in the Eastern District of Pennsylvania (hereinafter, "Philadelphia Action"). A true and correct copy of the Philadelphia Action is attached hereto as Exhibit 3.

34.   In their lawsuit, the Steeles alleged that by seeking to enforce the Fund's reimbursement rights for medical bills paid on Ms. Steele's behalf and providing notice of the same to the Steele's counsel of record, Defendant Mark Tanner, Plaintiff Boilermakers National Health and Welfare Trust, Blake & Uhlig, P.A., and Attorney Lauren Fletcher violated the Fair Debt Collection Practices Act ("FDCPA") and Pennsylvania state collection laws.[1] (Exhibit 3, ¶¶ 25-38).

35.   In the Philadelphia Action, filed after the Kansas Action, the Steeles are seeking declaratory relief and have asked the Eastern District of Philadelphia to issue an order stating that the Trust's reimbursement rights, the primary issue in this lawsuit, are invalid. (Exhibit 3, ¶¶ 39-44).

36.   The Trust's principal place of business is in Kansas City, Kansas and documents related to these proceedings are located within the District of Kansas. The Trust is also administered in Kansas City, Kansas. (Exhibit 1, Affidavit of Pamela S. Dumler, ¶ 2).

---

[1] In the Philadelphia Action, Counsel for the Trust, Blake & Uhlig, P.A., and Attorney Lauren Fletcher have filed a *Motion to Dismiss Plaintiffs' Complaint for Failure to State a Claim Upon Which Relief Can Be Granted or, in the Alternative, to Transfer the Case.* A copy of the Memorandum In Support is attached hereto as Exhibit 4.

## ARGUMENTS AND AUTHORITIES

### A.    Standard for Motions Filed Under Fed. R. Civ. P. 12(b)(2)

Plaintiffs bear the burden of establishing that a forum has personal jurisdiction over defendants. *OMI Holdings, Inc. v. Royal Insurance Co. of Canada*, 149 F.3d 1086, 1091 (10th Cir. 1998). However, in the preliminary stages of litigation, "the plaintiff's burden is light." *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995)(*citing Doe v. National Medical Servs.*, 974 F.2d 143, 145 (10th Cir.1992)).

When presented with a motion filed under Fed R. Civ. P. 12(b)(2), if a district court does not hold an evidentiary hearing, plaintiffs "need only make a prima facie showing of personal jurisdiction to defeat the motion." *Id.* (internal citations omitted). Using affidavits and other written materials, plaintiffs can make the requisite prima facie showing that the facts, if true, would support jurisdiction over the defendant. *Id.* When evaluating the prima facie case, "the court is bound to resolve all factual disputes in favor of the plaintiff in determining whether he has made the requisite showing." *AST Sports Science, Inc. v. CLF Distribution Limited*, 514 F.3d 1054, 1057 (10th Cir. 2008).

Once plaintiffs have made their prima facie showing, defendants must present "a compelling case demonstrating 'that the presence of some other considerations would render jurisdiction unreasonable.'" *Id.* (internal citations omitted).

### B.    This Court Has Personal Jurisdiction Over Defendants.

Section 502(e)(2) of ERISA provides for nationwide service of process. 29 U.S.C. § 1132(e)(2). The Tenth Circuit has held that when a statute specifically calls for nationwide service of process, nationwide contacts alone are not enough to justify personal jurisdiction;

courts must also engage in a due process analysis. *See Peay v. Bellsouth Medical Assistance Plan*, 205 F.3d 1206 (10th Cir. 2000).

The Tenth Circuit follows a modified minimum contacts analysis in cases involving statutes with nationwide service of process provisions. *B-S Steel of Kansas, Inc. v. Texas Industries, Inc.*, 229 F.Supp.2d 1209 (D.Kan. 2002). Under the modified analysis, it is the defendant who has the burden to show "that his liberty interests actually have been infringed." *Id.* Additionally, a defendant must demonstrate "that the exercise of jurisdiction in the chosen forum will 'make litigation so gravely difficult and inconvenient that [he] really is at a severe disadvantage in comparison to his opponent.'" *Id.* at 1215; *Peay*, 205 F.3d at 1212 (internal citations omitted).

The Tenth Circuit emphasized that "it is only in highly unusual cases that inconvenience will rise to a level of constitutional concern," particularly since "in this age of instant communication and modern transportation, the burdens of litigating in a distant forum has lessened." *Peay*, 205 F.3d at 1212[2]; *see also AST Sports Science, Inc.*, 514 F.3d at 1061 (*quoting Burger King Corp v. Rudzewicz*, 471 U.S. 462, 472 (1985)); *American Builders & Contractors Supply Co., Inc. v. Lyle*, 2006 WL 3533090, \*3 (D.Kan. 2006)("[d]efending a suit in a foreign jurisdiction is not as burdensome as in the past"); *Board of Trustees, Sheet Metal Workers' National Pension Fund et al. v. Elite Erectors, Inc.*, 212 F.3d 1031, (7th Cir. 2000) ("Easy air transportation, the rapid transmission of documents, and the abundance of law firms with nationwide practices, make it easy these days for cases to be litigated with little extra burden in any of the major metropolitan areas.")

---

[2] In *Peay*, the Court ultimately held that the court had jurisdiction over the Defendant.

In weighing whether personal jurisdiction exists in the plaintiff's chosen forum, the Tenth Circuit instructs courts to look to the following factors:

> (1) the extent of the defendant's contacts with the place where the action was filed;
> (2) the inconvenience to the defendant of have to defend in a jurisdiction other than that of his residence or place of business, including (a) the nature and extent and interstate character of the defendant's business, (b) the defendant's access to counsel, and (c) the distance from the defendant to the place where the action was brought;
> (3) judicial economy;
> (4) probable situs of discovery proceedings and the extent to which the discovery proceedings will take place outside of the defendant's residence or place of business; and
> (5) the nature of the regulated activity in question and the extent of impact that the defendant's activities have beyond the borders of his state of residence or business.

Id. at 1212.

Finally, even in the unlikely event that "a defendant successfully demonstrates that litigation in the plaintiff's chosen forum is unduly inconvenient, the 'jurisdiction will comport with due process only if the federal interest in litigating the dispute in the chosen forum outweighs the burden imposed on the defendant.'" *Id.* at 1213 (internal citations omitted). To determine whether the alleged infringement on a defendant's liberty is justified sufficiently by government interest, the Tenth Circuit instructs courts to review:

> [T]he federal policies advanced by the statute, the relationship between nationwide service of process and the advancement of these policies, the connection between the exercise of jurisdiction in the chosen forum and the plaintiff's vindication of his federal right, and concerns of judicial efficiency and economy...<u>Where Congress has provided for nationwide service of process, courts should presume that nationwide jurisdiction is necessary to further congressional objectives.</u>"

*Id.* (emphasis added).

11

**2.    Defendants have failed to show that the level of inconvenience reaches a level of constitutional concern.**

Using the above rubric, it is clear that Plaintiffs have fulfilled the requisite prima facie showing of personal jurisdiction.

**a.    29 U.S.C. § 1132(e)(2) clearly provides for nationwide service of process.**

Both Plaintiffs and Defendants are in agreement that Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), authorizes nationwide service of process. (Doc. 18, p. 4).

**b.    Defendants have sufficient contacts with the District of Kansas.**

In their *Motion*, Defendants claim they do not have sufficient contacts with the State of Kansas. In support of their claim, Defendants state that they have never physically been in Kansas and cite to a case where phone calls and "ten-to-twenty faxes and letters during the course of contract negotiations were insufficient to establish minimum contacts." Defendants have, to say the least, oversimplified the nature of their relationship with the Plaintiffs.

First, it is important to note that physical presence is not required to prove personal jurisdiction; as the 10th Circuit explained in *AST Sports Science, Inc.*, modern communications can obviate the need for a plaintiff to have a physical presence in the forum state. *AST Sports Science, Inc.*, 514 F.3d at 1059. It is also important to note that courts look not just to the quantity of Defendants' contacts, but to the *quality* of contacts. *See, OMI Holdings*, 149 F.3d at 1092. When reviewing communications, courts consider whether the defendant purposely availed himself or herself of the privilege of conductive activities in Kansas, whether defendants' actions were directed towards residents of Kansas, and whether plaintiffs' claims result from actions by the defendant that create a substantial connection with Kansas. *American Builders & Contractors Supply Co., Inc. v. Lyle*, 2006 WL 3533090 (D.Kan. 2006).

The relationship between the Trust and the Steeles is more than just the letters and telephone calls cited by Defendant in their *Motion*. (Statement of Facts, ¶¶ 2-31). Every time either Mr. or Mrs. Steele visit a covered provider and assigns to that covered provider authorization to submit a claim to the Trust and collect benefits, the Trust's Kansas City, Kansas offices review the claim, determine whether or not it is covered under the terms of Plan M, and pay the providers under the terms of the Plan. One hundred thirty-four (134) claims have been submitted to the Trust on behalf of the Steeles by covered providers in relation to the Pennsylvania Medical Malpractice Action; each of these claims is a separate contact by which the Steeles have purposely availed themselves of benefit payments from the Trust in Kansas. (Statement of Facts, ¶ 4). From Kansas, the Trust has paid five hundred thirty thousand four hundred fifty-two dollars and fifty-two cents ($530,452.52) in benefit payments relating to the Pennsylvania Medical Malpractice Action to health care providers on behalf of the Steeles and has sent the Steeles "Explanations of Benefits" which explain the benefits paid out on the Steeles' behalf. (Statement of Facts, ¶ 4).

As explained above, in the context of a minimum contacts analysis, the content and quality of Defendants' communications is paramount, not the sheer number of times Defendants contacted the Trust. *See OMI, supra.* Here, the telephone calls and letters between Ms. Steele and Trust representatives directly related to the claims the Trust paid on behalf of Ms. Steele as a result of medical malpractice; it is these claims that form the basis of the present suit. (Statement of Facts ¶¶ 5, 7, 8, 9, 10, 12, 13, 14, 15, 16). In addition, one of the medical benefit forms submitted by Ms. Steele to the Trust was a subrogation questionnaire in which she indicated that she hired Defendant Mark Tanner to represent her in legal proceedings involving the claims for which the Trust had paid. (Statement of Facts, ¶ 6).

13

Regarding Defendant Tanner, it may be true that Defendant Tanner has had fewer than a dozen interactions between himself and the Trust; however, as explained above, the quantity of communications is irrelevant. It is what the communications contained, how they impacted the Trust, and their effects in the District of Kansas that matter. *See id.* Attorney Tanner sent correspondence to the Trust, as well as Trust's counsel, stating that the Trust could not enforce its subrogation and reimbursement rights as they related to the Steeles. (Statement of Facts, ¶¶ 7, 12, 14, 16, 23, 26, 30). It was Attorney Tanner's correspondence, on behalf of the Steeles, that provided notice to the Trust of the Steeles' intent to violate the terms of the Plan and began these litigation proceedings. (Statement of Facts, ¶ 30).

        c.      **Due to the nature of the ERISA claim, inconvenience to the Defendants in defending themselves in Kansas will not violate due process.**

Regardless of their claims, Defendants will suffer no more inconvenience if the case is litigated in Kansas than if it were litigated in Pennsylvania. Defendants have alleged that they will incur legal fees as the result of hiring Kansas counsel. This argument is flawed since Defendants would, presumably, hire counsel in either jurisdiction. It is unclear how incurring legal fees for counsel in Kansas will be more inconvenient than incurring legal fees in Pennsylvania.

It is also important to note that since most ERISA subrogation/reimbursement lawsuits are disposed of prior to trial, it is unlikely that Defendants will be required to travel to Kansas. Whether an employee benefit plan's subrogation rights under ERISA are enforceable often does not present any genuine issues of material fact and is routinely decided through motions for summary judgment. See, e.g. *Sereboff v. Mid Atlantic Medical Services, Inc.*, 547 U.S. 356, 126 S.Ct. 1869 (2006)(district court granted plan's motion for summary judgment to enforce

14

equitable subrogation rights, which was affirmed by Supreme Court); *Great-West Life & Annuity Insurance Co. v. Knudson*, 534 U.S. 204 (2001)(motion for summary judgment granted and affirmed); *Administrative Committee of the Wal-Mart Associates Health and Welfare Plan v. Willard*, 393 F.3d 1119 (10th Cir. 2004)(The parties agreed that a formal trial was unnecessary and that the dispute could be resolved on the cross motions for summary judgment); *Administrative Committee for the Wal-Mart Stores, Inc. Associates' Health and Welfare Plan v. Horton*, 513 F.3d 1223 (11th Cir. 2008); *Findlay Industries, Inc. v. Bohanon*, 2007 WL 2669191 (N.D.Ohio 2007); *Administrative Committee of Wal-Mart Stores, Inc. Associates' Health and Welfare Plan v. Shank*, 500 F.3d 834 (8th Cir. 2007).  Indeed, the primary defense asserted by Defendants herein raises a purely *legal* issue: whether ERISA preempts a Pennsylvania state law that, according to Defendants, renders unenforceable the Fund's subrogation rights under the terms of the Plan.  The Supreme Court itself, however, has already resolved this issue, holding that ERISA *does* preempt a virtually identical Pennsylvania "anti-subrogration" statute that purports to limit a self-funded plan's subrogation rights as provided under plan language.  *See FMC Corp. v. Holliday*, 498 U.S. 52 (1990)(district court granted participant's motion for summary judgment on the basis of Pennsylvania's anti-subrogation law, which ruling was reversed by the Supreme Court on ERISA preemption grounds).

      **c.    Judicial economy dictates that the action should continue in the District of Kansas.**

As briefly mentioned above, and explained in further detail below, after Plaintiffs filed the instant case, the Steeles filed the Philadelphia Action and have asked the Eastern District of Philadelphia to issue an order stating that the Trust's reimbursement rights, the primary issue in the lawsuit, are invalid.

15

Judicial economy dictates that the issue of the Trust's reimbursement rights should be adjudicated in one proceeding, as to avoid the hazard of two differing opinions from district courts in two different judicial circuits. In order to avoid further litigation and conflicting judgments, judicial economy dictates that the most expedient and efficient means of determining the Trust's reimbursement rights is in the District of Kansas, particularly since it was the first court asked to enforce Plaintiffs reimbursement rights under the terms of Plan M.

      **d.**     **Discovery is likely to be minimal and located in Kansas.**

Defendants' argument that all related documents and witnesses are located in Pennsylvania is erroneous. First of all, as explained above, since the primary issue in this case raises the purely legal issue of the Fund's subrogation rights under ERISA, Plaintiffs do not anticipate extensive discovery. Contrary to Defendants' contention, it is also likely that the majority of discovery will be located in Kansas. Neither the Steeles nor the medical providers involved in the malpractice action are necessary witnesses in this lawsuit since the dispute is over the rights of the Trust and not whether the medical payments made were justified. The only necessary witnesses and documents in this suit are located at the Trust's principal place of business in Kansas City, Kansas.

Second, Defendants' arguments that (1) it is necessary to establish that the medical bills paid by the Trust were not recovered in the Pennsylvania lawsuit and (2) that such evidence is beyond the subpoena power of this Court are irrelevant. The Trust has the right to recover regardless of how the settlement received by the Steeles in the Pennsylvania Medical Malpractice Action is characterized. As explained above, this lawsuit involves the reimbursement rights of the Trust; the issue of whether the medical bills paid by the Trust were recovered in the Pennsylvania lawsuit is purely legal in nature and must be analyzed under the

terms of the Plan and ERISA. *See FMC Corp. v. Holliday*, 498 U.S. 52 (1990). Pennsylvania law has no place in this lawsuit. Plaintiffs have consistently maintained that the language of the Plan and ERISA control this lawsuit. Plaintiffs have also consistently maintained that ERISA preempts all Pennsylvania laws relating to the Steeles' recovery in the Pennsylvania Medical Malpractice Action. *See id.* Since ERISA preemption is strictly a legal issue, discovery will not be needed on this issue.

Defendants' argument regarding the Court's subpoena power is irrelevant and erroneous. It is true that this Court cannot issue subpoenas in the Eastern District of Pennsylvania. *See*, Fed. R. Civ. P. 45. This fact, however, does not prevent discovery against any third-parties who might be located in Pennsylvania—it simply means that the subpoenas must be issued from a Pennsylvania court rather than this Court. It is unclear how this issue relates to Defendants' personal jurisdiction claim.

Finally, Defendants have written of their intent to use medical records it claims are located in Pennsylvania. Again, it is difficult to fathom why the existence of medical records in Pennsylvania rises to the level of unconstitutional inconvenience. The parties would be required to obtain such medical records regardless of where they are located. Also, as pointed out above, the Trust has the claims that were submitted to the Trust on the Steeles' behalf, as well as copies of the Explanation of Benefit Forms ("EOB's") sent to the Steeles. (Statement of Facts, ¶ 4). These documents are in Kansas. (Statement of Facts, ¶ 36). This means that a significant portion of the records to which Defendants have referred are already located in the District of Kansas.

e.   **Since this lawsuit involves a multiemployer self-funded ERISA plan, the result of this lawsuit will impact participants well beyond the borders of Pennsylvania.**

Plaintiffs agree with Defendants' observation that the subrogation and reimbursement rights of the Trust, a self-funded ERISA employee benefit plan, affect union members and their families throughout the United States. These same subrogation and reimbursement rights are at issue in this lawsuit. Therefore, using Defendants' own terms, the effect of Defendants' refusal to abide by the terms of the Plan impacts other participants and beneficiaries of the Plan nationwide, not just those in the Eastern District of Pennsylvania.

f.   **Federal interest in litigating the dispute in the District of Kansas clearly outweighs the burden imposed on Defendants.**

The next step in a due process analysis is to review the federal interests at stake and determine whether they outweigh the burden on the Defendant. In *Peay*, the Tenth Circuit explained that a district court should look to the federal policies advanced by ERISA, the relationship between nationwide service of process and the aforementioned federal policies, the connection between the exercise of jurisdiction in Kansas and the Trust's vindication of its rights, and concerns of judicial efficiency and economy. *See Peay*, 205 F.3d at 1213. Importantly, the Tenth Circuit reasoned that since Congress provided for nationwide service of process in ERISA suits, courts should presume Congress believed nationwide service of process is necessary to further ERISA's congressional objective. *See id.*

It is clear that Congress intended to include nationwide service of process in ERISA to further the underlying policies. As stated in Title I, Section 2(b), the policy behind ERISA is "to protect interstate commerce and the interests of participants in employee benefit plans and their beneficiaries, ... by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions and

ready access to Federal Courts." 19 U.S.C. § 1001(2)(b). To ensure that employee benefit plans run efficiently, ERISA allows plan designers to design such nationwide employee benefit plans without the obstacle of fifty different state laws and regulations. *FMC Corp. v. Holliday*, 498 U.S. 52, 60 (1990). Without these obstacles, plan designers can avoid complicating the administration of a nationwide plan and prevent inefficiencies that the plan might have to offset with decreased benefits. *Id.*

Allowing the Trust to bring suit in the District of Kansas comports with the fundamental policies underlying ERISA. As the Sixth Circuit explained,

> "[t]here is nothing fundamentally unfair in permitting the plan, which is administered like a trust, to bring suits where it is located. While it is inconvenient to the defendants, it is convenient to the plan, reducing its costs, to the benefit of all plan beneficiaries. Congress has balanced the plan's interest and permitted suit where the plan is located."

*Medical Mutual of Ohio v. deSoto*, 245 F.3d 561 (6th Cir. 2001). Simply put, although Defendants may experience some inconvenience, allowing the Trust to litigate the lawsuit in Kansas will reduce costs to the benefit of all plan beneficiaries, not just Defendants.

**B.** **This Court Should Deny Defendants' Motion for Failure to State a Claim Against Defendants Mark Tanner and the Feldman Shepherd Law Firm.**

Defendants Mark Tanner and the Feldman Shepherd law firm have asked this Court to dismiss the lawsuit against them for failure to state a claim upon which relief can be granted. "[I]t is well established that a 'complaint should not be dismissed for failure to state a claim 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Issa v. Comp USA*, 354 F.3d 1174, 1177 -1178 (10th Cir. 2003). In 12(b)(6) proceedings, courts view the facts in a complaint "in a light most favorable to the plaintiff." *Stroede v. Chase Manhattan Automotive Finance Corp.*, 2009 WL 1690729, 1

19

(D.Kan. 2009)(*citing Zinermon v. Burch*, 494 U.S. 113, 118 (1990); *Swanson v. Bixler*, 750 F.2d

810, 813 (10th Cir.1984)). "To survive a motion to dismiss, a complaint must present factual

allegations, assumed to be true, that 'raise a right to relief above the speculative level' and must

contain 'enough facts to state a claim to relief that is plausible on its face.'" *Creamer v. Ellis*

*County Sheriff Dept.*, 2009 WL 1870872, 3 (D.Kan. 2009)(*quoting Bell Atl. Corp v. Twombly*,

550 U.S. 544, ----, 127 S.Ct. 1955, 1965 (2007)).

Here, it is clear that Plaintiffs have valid ERISA claims against Defendants Tanner and

Feldman Shepherd.    ERISA specifically grants fiduciaries the ability to obtain equitable relief

to redress violations of the terms of the Plan. 29 U.S.C. §1132(a)(3); *See Sereboff v. Mid. Atl.*

*Med. Svcs., Inc.*, 547 U.S. 256 (2006).  Under ERISA Section 502(a)(3), a fiduciary can bring a

civil action to enjoin any act which violates any provision of the title or the terms of the Plan and

to enforce any provisions of ERISA and the Trust; the Trust and its fiduciaries are not limited to

filing suit against only participants or beneficiaries. 29 U.S.C. § 1132(a)(2).  Under *Sereboff* all

the Trust is required to do is identify a fund, separate and distinct from the Steeles' general

assets, "from which reimbursement will be taken and specify a particular share to which the Plan

is entitled." *Mutual of Omaha Ins. Co. v. Estate of Arachikavitz* , 2007 WL 2788604, 2 (D.Nev.

2007)(*citing Administrative Committee of Wal-Mart Stores, Inc v. Salazar,* 2007 WL 2409513,

*7 (D.Ariz. 2007*)*.

Plaintiffs have filed this suit to enforce the subrogation and reimbursement provisions of

Plan M and to be reimbursed for the amount of benefits it paid out on behalf of Defendants

Judith and Timothy Steele. (Statement of Facts, ¶¶ 2, 4).  Defendants Mark Tanner and Feldman

Shepherd are currently holding the identifiable funds which constitute the equitable relief

claimed by the Trust. (Doc. 17, Paragraph 20).  The Plan clearly identifies its reimbursement

rights. (Statement of Facts, ¶ 2). Defendant Mark Tanner is a necessary party "who will be affected by the judgment [of the court] and against [whom] it will in fact operate." *Anderson v. Dergance*, 2009 WL 1702820, 3 (N.D.Ill. 2009)(*quoting West Coast Exploration Co. v. McKay*, 213 F.2d 582, 592 (C.A.D.C. 1954)). Similarly, Defendant Feldman Shepherd is holding the funds which are subject to the Trust's equitable lien. *Id.* Therefore, Defendants Mark Tanner and Feldman Shepherd are proper parties to this action against whom the Plan has a valid cause of action for equitable relief.

### C.   The District of Kansas is the proper form for these proceedings; therefore, this Court should deny Defendants' Motion to Transfer.

28. U.S.C. § 1404(a) vests district courts broad discretion to determine "whether convenience and fairness considerations weigh in favor of transfer." *Chrysler Credit Corp. v. Country Chrysler, Inc.*, 928 F.2d 1509, 1516 (10th Cir. 1991). The party moving to transfer a lawsuit "bears the burden of establishing that the existing forum is inconvenient." *Id.* at 1515. "Unless the balance is strongly in favor of the movant the plaintiff's choice of forum should rarely be disturbed." *Scheidt v. Klein*, 956 F.2d 963, 965 (10th Cir.1992). Defendants have failed to meet their burden.

### 1.   The first-filed rule mandates that this matter be heard in Kansas.

When determining whether a lawsuit should be transferred under 28 U.S.C. § 1404(a), courts, including the Tenth Circuit, use what is known as the "first-filed" rule. *Oil & Gas, L.L.C. v. Leading Solutions, Inc.*, 2007 WL 2402723 (D.Kan. 2007)(citing *Buzas Baseball, Inc. v. Bd. of Regents of the Univ. of Ga.*, 189 F.3d 477 (10th Cir. 1999)). The "first-filed" rule stands for the proposition that when "duplicative lawsuits are pending in separate federal courts, the entire action should be decided by the court in which the action was first filed." *Id.* The purpose of the "first-filed" rule is to ensure that litigants receive a single determination of their controversy

21

rather than multiple decisions, which may conflict and require several appeals to different circuits. *Id.*

First, it is clear that this Kansas Action and the Philadelphia Action involve virtually identical issues. In Count VII [sic] of the Philadelphia Action's Complaint, the Steeles seek declaratory judgment that the Fund may not exercise its right of reimbursement. (Statement of Facts, ¶ 35). This is the exact issue present before this court.

Second, Defendants' claim that transfer of the instant case to Pennsylvania would not violate the "first-filed" rule is patently wrong; under the "first-filed" rule, it is clear that Plaintiffs filed their suit first and the District of Kansas is the proper forum.[3] On June 17, 2009, counsel for Plaintiffs sent notice to Defendant Tanner, via U.S. and electronic mail, that the Trust would be filing a lawsuit to enforce its reimbursement lien. (Statement of Facts ¶ 31). On June 18, 2009, Plaintiffs filed this lawsuit. (Statement of Facts ¶ 32). On June 24, 2009, Defendants filed the Philadelphia Action. (Statement of Facts, ¶ 33). Regardless of Defendants' argument, the dates of service are irrelevant; the district in which the first action was filed is the appropriate district for these proceedings.

A lower court's discretion to deviate from the application of the "first-filed" rule is limited to cases of "bad faith, anticipatory filing, and forum shopping." *Id.* None of these scenarios are present here. Plaintiffs filed this lawsuit in good faith, in a proper venue, against proper Defendants. Plaintiffs notified Defendant Tanner of their intent to file a lawsuit to enforce Plaintiffs' reimbursement rights, not in anticipation of another lawsuit. Plaintiffs filed suit in Kansas, proper venue under ERISA. Forum shopping is not an issue in these proceedings

---

[3] *See Exhibit 4, supra.*

since ERISA, not state law, governs this lawsuit. Therefore, there this Court should follow the well-established "first-filed" rule and keep this lawsuit in the District of Kansas.

### 2. Transfer to Pennsylvania is improper since Defendant has filed a Declaratory Action in the Eastern District of Pennsylvania.

Even assuming, *arguendo,* that the court follows Defendants' proposed "first-served" rule, this suit should not be transferred since Defendants' Philadelphia Action is an improper attempt to have the Eastern District of Philadelphia determine the substantive issues pending before this Court. A party's right to seek declaratory relief "does not necessarily constitute an anticipatory filing for the purposes of an exception" to the first-to-file rule; however, it is often suspected to be an improper anticipatory filing. *Id.* (*citing MCS Music,* 2007 WL 726835, at *2; *MedSpring Group, Inc. v. Atl. Healthcare Group,* No. 05 CV 115, 2006 WL 581018, at *4 (D.Utah Mar. 7, 2006); *Buzas,* 189 F.3d at 477 (10th Cir.1999)). Here, it is clear that Defendants filed the Philadelphia Action after receiving notice of the Plaintiffs' intent to file this action, though before actual knowledge that Plaintiffs filed the present lawsuit. It is also clear that the Defendants have requested the Philadelphia court rule on issues identical to those before this Court. Therefore, transfer of this suit to the Eastern District of Pennsylvania is improper since it is clear the Defendants filed suit in the Eastern District of Pennsylvania in anticipation of this suit and in an attempt to reap the benefit of the "first-filed" (or, rather its proposed "first-served" rule) through improper means.

### 3. Convenience dictates that this case be tried in Kansas.

It is clear that, all things considered, the District of Kansas is the most convenient forum in which to try this lawsuit. The underlying dispute in this lawsuit involves whether or not Plaintiffs, a self-funded ERISA employee benefit plan and its Trustees, have a right to reimbursement for funds previously expended on participants' behalf. The Trust is

23

headquartered and administered in Kansas. (Statement of Facts, ¶ 36). The majority, if not all, witnesses familiar with the operation of the Trust's Plan are located in Kansas, not the Eastern District of Pennsylvania. *See generally* Exhibit 1, Affidavit of Pamela S. Dumler. Furthermore, most of the documents related to this lawsuit are located within the District of Kansas. *See generally* Exhibit 1, Affidavit of Pamela S. Dumler. And, finally, neither the Steeles nor the medical providers involved in the malpractice action are necessary witnesses in this action.

Defendants' request to disturb Plaintiffs' chosen venue should also be considered in the context of the statute conferring venue in this case. In contrast to the general venue statute, which gives weight primarily to the residence of the defendant or the location of the events giving rise to the case, *see* 28 U.S.C. § 1391, ERISA contains a special venue provision that allows a case to be brought in any district where the Plan is administered. 29 U.S.C. § 1132(e)(2). This is in accord with the general scheme of ERISA, under which Congress intended to provide "ready access to the Federal Courts," 29 U.S.C. § 1001(b), and "to remove jurisdictional and procedural obstacles." H.R. Rep. No. 93-533, 93rd Cong., 1st Sess. 17, *reprinted in* 1974 U.S.C.C.A.N. at 4639, 4655 (1974). Thus, the courts have held that in enacting ERISA, Congress "clearly struck the balance in favor of liberal venue." *Varsic v. United States Dist. Court*, 607 F.2d 245, 248 (9th Cir. 1979).

Given this, it should be the rare case where the Plan is denied its right to bring an action in the district of its administration simply because the locus of the defendants or the events lies elsewhere.[4] Any other construction would transform the special venue provision of ERISA into

---

[4] This is not to say that the relevant events in this case took place outside of Kansas. As demonstrated, the Fund administers and processes the payment of medial benefits nationwide. However, to the extent the relevant events are viewed to be the out-of-state receipt of those benefits, rather than the instate processing and payment of those benefits, then the relevant "events" would almost always occur outside of the Plan's district. Fully aware of this fact, Congress nonetheless chose to enact a special venue statute allowing such plans to litigate their claims in the district where they are administered.

24

the general venue provision of § 1391-- which gives no weight at all to the location of the plaintiff. *See Boilermaker-Blacksmith Nat'l Pension Fund v. Gendron*, 67 F. Supp.2d 1250, 1257 (D. Kan. 1999)("The Court acknowledges that it is inconvenient for defendants to litigate this case in Kansas. Disturbing plaintiffs' chosen venue should be more difficult in an ERISA case, however, because the special venue provision allows a case to be brought in any district where the plan is administered."); *Boilermaker-Blacksmith National Pension Fund v. Gendron*, 96 F.Supp.2d 1202 (D. Kan. 2000)(After the Tenth Circuit decided *Peay*, the Court analyzed personal jurisdiction over defendants using the *Peay* standard. The Court found "that plaintiffs' evidence [was] sufficient to make a prima facie showing of personal jurisdiction" under the *Peay* standard where defendant asserted she had never resided or done business in Kansas.).

## III.   CONCLUSION

For the reasons set forth above, Plaintiffs request this Court issue an order denying Defendant's *Motion to Dismiss for Lack of Personal Jurisdiction, to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted, or in the Alternative, to Transfer Venue.*

Respectfully submitted,

**BLAKE & UHLIG, P.A.**

/s/ Scott L. Brown
Martin W. Walter, KS Bar No. 17653
Scott L. Brown, KS Bar No. 20580
Lauren M. Fletcher, KS Bar No. 22198
753 State Avenue, Suite 475
Kansas City, Kansas 66101
Telephone: (913) 321-8884
Facsimile: (913) 321-2396
E-mail: mww@blake-uhlig.com
E-mail: slb@blake-uhlig.com
E-mail: lmf@blake-uhlig.com
**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that Plaintiffs' counsel served the foregoing upon

Defendant's counsel by electronically filed the foregoing with the Clerk of the Court using the

CM/ECF on this 12th day of August, 2009, and addressed as follows:

Brent Coverdale
Seyferth, Blumenthal & Harris, L.L.C.
300 Wyandotte St., Ste. 420
Kansas City, Missouri 64105
Telephone: (816) 756-0700
Facsimile: (816) 753-3700
E-mail: brent@sbhlaw.com

/s/ Scott L. Brown
Martin W. Walter, KS Bar No. 17653
Scott L. Brown, KS Bar No. 20580
Lauren M. Fletcher, KS Bar No. 22198
Blake & Uhlig, P.A.
753 State Avenue, Suite 475
Kansas City, Kansas 66101
Telephone: (913) 321-8884
Facsimile: (913) 321-2396
E-mail: mww@blake-uhlig.com
E-mail: slb@blake-uhlig.com
E-mail: lmf@blake-uhlig.com
**ATTORNEYS FOR PLAINTIFFS**